CERA LLP
Solomon B. Cera (Bar No. 099467)
Thomas C. Bright (Bar No. 169713)
Pamela A. Markert (Bar No. 203780)
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: tbright@cerallp.com
Email: pmarkert@cerallp.com

DUNCAN FIRM, P.A.
James H. Bartolomei III (Bar No. 301678)
809 W. 3rd Street
Little Rock, AR 72201
Telephone: (501) 228-7600
Email: james@duncanfirm.com

LAW OFFICES OF TODD M. FRIEDMAN, P.C.
Todd Friedman (Bar No. 216752)
Adrian R. Bacon (Bar No. 280332)
21550 Oxnard Street, Suite 780
Woodland Hills, CA 91367
Telephone: (877) 206-4741
Email: tfriedman@toddflaw.com
Email: abacon@toddflaw.com

HOBEN LAW
Bryan D. Hoben (admitted *pro hac vice*)
1112 Main Street
Peekskill, NY 10566
Telephone: (347) 855-4008
Email: bryan@hobenlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXIS HUNLEY and MATTHEW SCOTT BRAUER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>INSTAGRAM, LLC,<br><br>Defendant. | Case No.  3:21-cv-03778-CRB<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES BASED ON COPYRIGHT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Alexis Hunley and Matthew Scott Brauer, on behalf of themselves and all others similarly situated, for their first amended complaint against Defendant Instagram, LLC, allege upon personal knowledge as to their own conduct, and on information and belief based on the investigation of plaintiffs' counsel, as to all other conducted alleged herein, as follows.

## I.   INTRODUCTION

This case seeks to address whether Instagram, LLC ("Instagram"), the world's largest photo sharing application with more than 50 billion photos uploaded by over one billion Instagram users since 2012, is liable for secondary copyright infringement of third-party website publishers who violated Instagram users' exclusive display rights under the Copyright Act.

1.      Plaintiffs allege that Instagram created a scheme to generate substantial revenue for its parent, Facebook, Inc., by encouraging, inducing, and facilitating third parties to commit widespread copyright infringement using Instagram's "embedding" tool to display copyrighted works of Instagram users on third-party publisher websites, thereby vastly extending Instagram's reach across the Internet, but without appropriately compensating the copyright holders or granting third-party website publishers authorization to display Plaintiff's works.

2.      Instagram will seek to finally dismiss this case based on its reliance on its Terms of Use for Instagram Users, and point to the "Server Test," a legal doctrine created in the *Perfect 10* Ninth Circuit case from 2007, which is not mentioned or found anywhere in any version of Instagram's Terms of Use or Platform Policy for "embedding" copyrighted content. In other words, the application of the Sever Test is not simply a legal issue that Plaintiffs maintain is no longer applicable here, but is a factual issue in dispute based on the evidentiary record found in this case at this juncture and based on the Copyright Act being technology agnostic when it comes to the display right.

3.      Generally, "embedding" means the process of copying the unique hypertext markup language ("HTML") code (letters, numbers and symbols, etc.) assigned to the location of digital copy of the photo or video (also made up of code, in files known as jpegs for photos or mpegs for videos found on Instagram) published to the Internet, and the insertion of that code into a target webpage or social media post so that photo or video is displayed within the target post.

Within the Instagram environment, this means that third party website publishers (such as BuzzFeed.com and Time.com) can copy the HTML code of an Instagram user's post and paste it into the third party's website, causing the photo or video posted to that Instagram user's account to be simultaneously displayed on that third party website. Simply put, embedding is code interfacing with another form of code to cause a display of a photo or video to occur in two or more places at the same time (*e.g.,* Instagram and BuzzFeed.com and/or Time.com).

4.     Plaintiffs allege that when a third party embeds a copyrighted photo or video from an Instagram user's Instagram account to that third-party's website without a license, permission, or valid legal defense from the copyright owner, or from Instagram, this constitutes an infringement of the copyright owner's exclusive display right under the Copyright Act of 1976, 17 U.S.C. §101 *et seq*., and therefore violates the law.

5.     Creators of photos and videos generally register their works with the U.S. Copyright Office for the primary purpose of licensing those works because each such registered video or photo has value. Instagram, through the direction and control of Facebook, created and encouraged the use of Instagram's embedding tool to execute a scheme to expand and grow Instagram's presence on third party websites to obtain a direct financial benefit derived from increased traffic, impressions, clicks and views monetized through advertising revenue on Instagram. The effect of this scheme has been the usurpation of the value of the copyrighted works, as the practice of embedding posts from Instagram has vitiated and diluted the market for licensing fees. By encouraging third party online publishers such as BuzzFeed.com, Time.com, Mashable.com, and others to use the embed tool to display copyrighted works without a license or permission from the copyright owners or from Instagram, Instagram is secondarily liable for each instance of those online publishers infringing a copyright owner's display right caused by the unauthorized embedding of the respective photo from the user's Instagram post.

6.     From about July 2013 until June 2020, Instagram knew or recklessly disregarded that no third party ever obtained a license or permission from Instagram to embed a copyrighted photo or video. Instagram also knew or recklessly disregarded that no third party ever obtained a license or permission from the copyright owner each time the embed tool was used to display a

copyrighted work. Instagram also regularly and systematically handled, controlled, made reference to, and touched valuable copyrighted works with the intent and knowledge that third party online publishers were embedding those works without ever obtaining a license from the copyright owner, which in turn generated more traffic, more clicks, more likes, more shares, and other revenue-generating conduct for Instagram born out of the infringing activity of third parties.

7.      Instagram misled the public to believe that anyone was free to get on Instagram and embed copyrighted works from any Instagram account, like eating for free at a buffet table of photos, by virtue of simply using the Instagram embedding tool. Instagram, by acts of commission or omission, also misled third parties to believe that they did not need to obtain a license or permission from the copyright owner to embed those works. This dramatically changed in June 2020 when Instagram publicly admitted via a Facebook spokesperson that third parties in fact needed to secure a license or permission from the copyright holders to embed copyrighted works. *See* https://arstechnica.com/tech-policy/2020/06/instagram-just-threw-users-of-its-embedding-api-under-the-bus/.

8.      By this admission, Instagram has been caught red-handed in its scheme to usurp the value from copyrighted works for its own benefit in contradiction of its 2012 promise not to sell and monetize copyright owner's photos and videos to third parties. Instead, Instagram actively and directly encouraged, solicited, induced, facilitated, and handled copyrighted works in its efforts to cause third party "embedders" to use the embed tool which, in turn, caused copyrighted works to be displayed, republished, publicly performed and distributed, without compensation, and in direct and indirect violation of the Copyright Act.

9.      To make matters even more problematic for copyright owners who published their photos and videos on Instagram, Instagram did not provide any tool, device or meaningful way for copyright owners to control or track third party embeds of their Instagram posts, thereby depriving copyright owners of the ability to discover alleged infringements. Meanwhile, Instagram retained for itself the ability to track embeds of Instagram user content across the Internet. It not only shopped certain user content to online publishers for embedding, but it also retained for itself the technological means and ability to track copyrighted works embedded on

third party websites – all the while retaining 100% of the benefit and/or revenue from the infringing activity of third-party embedders – of which Instagram had actual and/or constructive knowledge.

10.     From 2013 to 2021, Plaintiffs and members of the Class who owned copyrighted works uploaded their intellectual property in the form of photo and videos to Instagram with the expectation and trust that Instagram (and its parent Facebook) would honor, protect and respect their copyrighted works.  Therefore, Instagram's use of the embed tool and scheme violated each user's exclusive display rights under the law by its scheme. This scheme utilized the embedding tool to convert Plaintiffs and members of the Class's copyrighted works to Instagram's benefit. Instagram misled by causing Plaintiff and members of the Class to believe Instagram would protect and respect copyright owners' works based on Instagram's terms of use, the contract that allegedly binds users to Instagram. Instead, Instagram denied copyright owners any meaningful opportunity or means to discover and prevent public display of their works that infringed their copyrights through the embed tool. Plaintiffs and members of the Class are thus victims of Instagram's embedding scheme. No tool exists for copyright owners to police the extensive infringement of their copyrighted works. Instagram knowingly exploited these limitations to maximize its (and its parent Facebook's) insatiable drive for user volume and the resulting advertising revenue. The more Instagram could induce and encourage third parties to embed copyrighted works from Instagram, the more revenue Instagram generated from traffic and advertising revenue.

11.     Plaintiffs and the members of the Class are victims of a scheme that denies the copyright owner the right to protect their copyrighted works when uploaded to Instagram. In other words, Instagram knowingly deprived the copyright owner of any means, device or tool to protect their copyrighted works. This action seeks to redress Instagram's culpable conduct in effectuating its scheme to use third parties to expand and grow Instagram's platform beyond the Instagram app and Instagram.com website. Instagram's scheme caused third party website publishers to believe they were "free" to embed valuable copyrighted works into their websites without paying a licensing fee to copyright owners, and in turn Instagram directly benefited from the significant

traffic, views and impressions generated from users viewing and interacting with the display of the embedded copyrighted works. Instagram is liable for damages for each copyrighted work infringed by each third-party embedder.

## II.    PARTIES

12.    Plaintiff Alexis Hunley is a resident of California. She is the owner of copyrighted works that have been unlawfully embedded from Instagram without her permission, a license or other valid legal defense, and for which Hunley has not been compensated. Specifically, BuzzFeed, Inc. embedded her copyrighted photo, attached as Exhibit A (page 10), from her Instagram account into a BuzzFeed post about the 2020 George Floyd protests without her permission or a license. The copyrighted photo is Exhibit B.  The Copyright Registration for Hunley's photo is Exhibit C.  Hunley's Instagram account and the photo (Exhibit B) are found at https://www.instagram.com/byalexishunley/.

13.    Plaintiff Matthew Scott Brauer is a resident of Massachusetts. He is the owner of copyrighted works that have been unlawfully embedded from Instagram without his permission, a license or other valid legal defense, and for which Brauer has not been compensated. Specifically, Time.com embedded his copyrighted photo from his Instagram account into a Time.com post about the 2016 presidential election without his permission or a license and is attached as Exhibit D (page 3). Brauer's copyrighted photo is attached as Exhibit E.  The US Copyright Registration for Brauer's photo is attached as Exhibit F. The title for the photo in the registration is JGP151203.JPG. Brauer's Instagram account where the photo (Exhibit E) is found at https://www.instagram.com/mscottbrauer/.

14.    Defendant Instagram, LLC is a Delaware limited liability company with its principal place of business at 1601 Willow Road, Menlo Park, California 94025. Instagram is wholly owned by Facebook, Inc., and is located within this judicial district.

## III.    JURISDICTION AND VENUE

15.    This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq*.

16.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

17.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) because: (i) members of the Class are citizens of a State different from that of Defendant Instagram; and (ii) aggregating the claims of individual Class members, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. Further, 28 U.S.C. 1332(d)(5) does not apply because (i) Defendant is not a State, State official, or other governmental entity against whom the Court may be foreclosed from ordering relief, and (ii) the number of members of the Class in the aggregate exceeds 100.

18.     This Court has personal jurisdiction over Defendant. Instagram maintains its corporate headquarters in California and in this District. Defendant has transacted business within California and contracted to supply goods or services in California in connection with the matters giving rise to this suit. Defendant has also contributed to copyright infringement causing injury to Plaintiffs and members of the Class in California. Defendant regularly solicits and does business in California and derives substantial revenue therefrom.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a) because Defendant is headquartered in this District, and a substantial part of the events and transactions giving rise to the claims alleged herein occurred in this District.

20.     In addition, Instagram's terms of use provide that all claims against it must be litigated in the United States District Court for the Northern District of California.

## IV.     FACTUAL ALLEGATIONS

### A.     The Importance of Copyright and the Display Right

21.     Copyrights are the legal title to intellectual property by which creators of original content such as photos and videos protect their moral and economic rights in that content.

22.     Respecting and defending the financial value of creators' copyrighted works is a bedrock of our democracy, so important that the Founding Fathers enshrined the U.S. Constitution with specific references to copyrights, and which expressly gave Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors

and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. Article I, Section 8. "Copyright law encourages people to create original works and thereby 'ultimately serves the purpose of enriching the general public through access to creative works.'" *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994). The Supreme Court of the United States found that by "establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 558 (1985).

23.     The importance of copyright enforcement is not limited to this country. Dating back to the early 1500s, French courts recognized that only the creators of works, or their assigned heirs, should have the right to publish those works. In 1886, more than 10 countries signed the Berne Convention for the Protection of Literary and Artistic Works, whose stated purpose is the "protection of the rights of authors in their literary and artistic works." The Convention ensures that authors are afforded the same protections in those signatory countries as they would enjoy within their own country, thereby promoting the worldwide distribution of creative works while at the same time ensuring that the rights of the author of a work created in one country will not be circumvented through the infringement of those rights in another country. As of the date of this complaint, 188 countries, including the United States, have signed the Berne Convention.

24.     The 1976 Copyright Act makes it illegal to publicly perform, publicly display, distribute, or reproduce a copyrighted work except in limited instances, and provides for statutory damages, willful statutory damages, and the right to recover attorneys' fees. 17 U.S.C. §§501 *et seq*.

25.     In 1976, the Copyright Act was amended to give content creators such as photographers and videographers an automatic copyright in their photos and videos.

26.     To file suit based on an alleged infringement, that automatic copyright interest must be registered with the U.S. Copyright Office. Plaintiffs allege that they secured valid copyright registrations in their respective photos.

27.     Plaintiffs allege that embedding from a social media platform to a third-party website of a copyrighted work without permission or a license or valid legal defense infringes on the display right set forth in the Copyright Act.

28.     Section 106 of the Copyright Act (the "Act") grants copyright owners the exclusive public display right and control of the economic value of their work.

29.     The legislative history of the display right under the Act confirms that the statute was intended to reach conduct like the use of embedding regardless of the physical location of where the digital copy of the file of a photo or video has been displayed or whether the primary infringer (BuzzFeed or Time.com in this instance) holds or stores a physical copy of the digital file.

30.     The physical location or possession of the displayed copy is not relevant or an underlying requisite to the display right under the plain language of the Copyright Act.

31.     Section 106(5) of the Copyright Act protects a copyright owner's exclusive right to "display the copyrighted work publicly." 17 U.S.C. § 106(5). One displays a work when he or she "show[s] a copy of it, either directly or by means of … any … device or process." *Id.* § 101. The Act provides that one displays a work "publicly" by, among other things, "transmit[ting] or otherwise communicat[ing]" the work to members of the public "by means of any device or process," and further defines "'transmit' a … display" as "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." Id.

32.     By the plain language of the statute, therefore, a direct infringer need not have obtained or reproduced his or her own copy of the work in order to "display" it, as long as he or she caused the images or sounds of the work—whether directly or indirectly, and by any "device or process"—to be "received beyond the place from which they are sent." *Id.; see also* H.R. Rep. No. 94-1476, at 64 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5677 ("In addition to the direct showing of a copy of a work, 'display' would include the projection of an image on a screen or other surface by any method ….").

33.     This reading is also consistent with the Supreme Court's admonition that, to determine whether a work is infringed under the Copyright Act, a court must "focus on the [work]

- 8 -

as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). For purposes of the display right, then, it is the viewer's experience that matters, not the internal mechanics of how the content is stored or retrieved. The Supreme Court's decision in *Tasini* instructed that courts must "focus on the [works] as presented to, and perceptible by" the public. 533 U.S. at 499.

34.     As the Supreme Court observed seven (7) years after *Perfect 10*, the Copyright Act is not concerned with the "behind-the-scenes way" that content is delivered, "invisibl[y]" to the recipient, *Am. Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2507-08 (2014), and such technical considerations are "not adequate to place [the defendant's] activities outside the scope of the Act," *id.* at 2511. Whether the displayed copy of the work resides on the defendant's server or that of a third party is therefore immaterial to the display right; the only question is whether the defendant caused the work to be viewed by members of the public, regardless of whether the defendant did so "*either* directly *or* by means of … *any* … device or process." 17 U.S.C. § 101 (emphasis added).

35.     Third party embedders (such as Time.com or BuzzFeed.com) through a "device or process" of using embed code (a process legally indistinguishable from in-line linking or other methods of providing HTML instructions for image retrieval), caused the images to be viewed on their own websites and, therefore, the third party embedders "displayed" those images for purposes of the Copyright Act.

36.     It is immaterial that a website publisher such as Time.com or BuzzFeed.com who chose to embed an image may not control whether that image is subsequently removed from the server on which it is hosted, in this instance Instagram. For purposes of the Copyright Act, the third party website publisher has the ability to control whether the image is shown on its website in the first place. The website owner controls the code for its website, and it is the act of using the embed code to show the image that is covered by the public display right.

37.     The Ninth Circuit in *Perfect 10* was careful to note that it "d[id] not address whether an entity that merely passively owns and manages an Internet bulletin board or similar

- 9 -

system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system posts infringing works." *Perfect 10*, 508 F.3d at 1160 n.6.

38. There are four key participants factually involved in the "display" right functions under the Copyright Act for this case. Participant one (1) is the creator of the copyrighted photo, in this example, Plaintiff Alexis Hunley. Participant two (2) is Defendant Instagram, the technology platform that stores the digital code (jpeg) for the physical copy of Plaintiff's photo and putting aside its other wrongful conduct related to its handling of copyrighted content for this illustration. Participant three (3) is the entity that copies and pastes more code (the API embed code) to cause Plaintiff's photo to simultaneously be displayed at both its place of origin (Instagram) and elsewhere on the internet. In this example, BuzzFeed.com, a non-party in this litigation, pasted the API code assigned to Plaintiff Hunley's Instagram post displaying the photo within a BuzzFeed.com article so that the photo appeared in the article at the very same time it is also displayed within Plaintiff's Instagram account. Participant four (4) is the viewer, a member of the public and a non-party in this case, who more likely than not does not know or care where the digital copy is stored, only that that they are seeing a display of the Photo inside the website to which the embed code was placed, in this example, BuzzFeed.com.

39. A visual step-by-step of the process of a "display" right infringement requires considering the viewer's perspective, which starts with the capturing/creation of a photo, then the photo being uploaded on Defendant Instagram's service, then it being displayed through the unauthorized embedding of that photo by a third-party publication (for example, BuzzFeed), and finally resulting in the viewer seeing the photo within the context of the target website.

1

Step 1: An Instagram user, such as Plaintiff Hunley, creates a photograph.

2

3

4

5

6

7

8

9

10

11

12

13

Step 2: The Instagram user then logs on to her account. Here, Plaintiff Hunley's account is

14   shown:



15

16

17

18

19

20

21

22

23

24

25

26

27

28

Step 3: The Instagram user then selects the photo to upload to her Instagram account, where she has the option of using Instagram's cropping and filters tools to make adjustments to the photo. Here, Plaintiff Hunley's photo at issue in this case has been cropped and toned in black and white:



Step 4: The Instagram user then publishes her photo to her Instagram profile and adds a caption as a post that also gets displayed to anyone who has subscribed to (i.e., "follows") that user, or, where the user's account is not set to "private," anyone who navigates to that user's publicly viewable profile and photos uploaded to that profile. Here, Plaintiff Hunley's photo is shown as it appears as uploaded to her Instagram account:



FIRST AMENDED CLASS ACTION COMPLAINT
FOR DAMAGES BASED ON COPYRIGHT INFRINGEMENT

CASE NO. 3:21-cv-03778-CRB

1

2

3

4

   Step 5: Instagram's technology allows anyone from the public, including non-Instagram users, to take a number of actions with regard to an Instagram user's individual posts, including reporting the photo for indecent content ("Report"), following or unfollowing the user ("Unfollow"), or embedding the photo for simultaneous display elsewhere on the Internet outside of the Instagram website or application ("Embed"), such as on BuzzFeed's website, without ever downloading the photo's digital jpeg file, similar to streaming a video from a cloud-based server.



5

6

7

8

9

10

11

12

13

14

15

16

17

   Step 6: To embed an Instagram user's post, anyone, including BuzzFeed.com merely needs to copy the unique HTML code assigned and created for that post, which Instagram generates code that causes the photo to be displayed ("API embed code") on websites such as BuzzFeed.com.



18

19

20

21

22

23

24

25

26

27

28

Step 7: Anyone with an internet connection, including BuzzFeed.com in this instance, can then "copy" and "paste" the API embed code into its website and cause the Instagram user's post (and the photo) to be displayed.  The fourth party here, **the viewer**, sees Plaintiff's photo in the BuzzFeed article and does not know (or likely care) that BuzzFeed does not have physical possession of the digital file of the Photo.  This is as the viewers see the display of the photo:





40.     As the Register of Copyrights testified during the hearings that led to passage of the Copyright Act, "the definition [of the display right] is intended to cover every transmission, retransmission, or other communication of a performance which reaches 'the public.'" H. Comm. on the Judiciary, 89th Cong., Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, at 25 (Comm. Print 1965). This was not limited to only the originating source that may be storing the image, but also included "any other transmitter who picks up his signals and passes them on." *Id.* at 24. The definition was thus not dependent on any one technical arrangement with regard to the storage or possession of the work, but rather was intended "to cover every method by which the images … can by picked up and conveyed to the public." *Id.* (emphasis added).

41.     The breadth of the statutory definition was due, in part, to the awareness that the evolution of technology was going to make "showing" a copy of the work as important as reproduction or distribution of that copy and, thus, an essential independent right of the copyright holder. As the Register of Copyrights stated:

> [W]e have become increasingly aware of the enormous potential importance of showing, rather than distributing, copies as a means of disseminating an author's work. In addition to improved projection equipment, the use of closed- and open-circuit television for presenting images of graphic and textual material to large audiences of spectators could, in the near future, have drastic effects upon copyright owners' rights. Equally if not more significant for the future are the implications of information storage and retrieval devices; when linked together by communications satellites or other means, these could eventually provide libraries and individuals throughout the world with access to a single copy of a work by transmission of electronic images. It is not inconceivable that, in certain areas at least, "exhibition" may take over from "reproduction" of "copies" as the means of presenting authors' works to the public, and we are now convinced that a basic right of public exhibition should be expressly recognized in the statute.

*Id.* at 20 (emphasis added).

42.     Congress therefore drafted the right broadly "to include all conceivable forms and combinations of wire[d] and wireless communications media, including but by no means limited to radio and television broadcasting as we know them." H.R. Rep. No. 94-1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678; *see also* 17 U.S.C. § 101 (defining "device" or "process" to include "one now known or later developed.").

43.     A website publisher's use of embed or HTML code to incorporate images from third-party social media or other websites so those images can be displayed to enhance the publisher's own website is within the broad scope of "any … device or process" as Congress intended.  The location of the "fixed" work is irrelevant to the display right merely because "copies" are defined in the Copyright Act as "material objects … in which a work is fixed … from which the work can be perceived, reproduced, or otherwise communicated, either directly or which the aid of a machine or device." 508 F.3d at 1160 (quoting 17 U.S.C. § 101).

44.     As Congress made clear, the display of a photo need not be so fixed—further confirming that the display of a work does not depend on the alleged infringer possessing a copy. *See* H.R. Rep. No. 94-1476, at 62, reprinted in 1976 U.S.C.C.A.N. at 5675 (explaining that "'[r]eproduction' under clause (1) of section 106 is to be distinguished from 'display' under clause (5)" because to be reproduced a work's "fixation in tangible form must be 'sufficiently permanent or stable to permit it to be perceived …for a period of more than transitory duration,'" and noting that "showing of images on a screen" would not therefore violate the reproduction right but "might come within the scope" of the display right), as the third party website publishers with Instagram's participation. Instagram violates the display right which is not to be conflated with the reproduction right.

45.     Requiring the storage of the content (and holding a copy) in order to "display" the work is not within the plain text of the definitions of the display right in the Copyright Act, but it also conflicts with the very structure of the Act.

46.     For example, the Copyright Act was intended to "recast[] the copyright as a bundle of discrete 'exclusive rights,' each of which 'may be transferred … and owned separately.'" Tasini, 533 U.S. at 495-96 (quoting 17 U.S.C. §§ 106, 201(d)(2)) (citation and footnote omitted). The Act protects the exclusive rights of reproduction, distribution and display separately, each of which is intended to capture distinct conduct. *See* 17 U.S.C. § 106(1), (3), (5); *see also* 2 *Melville B. Nimmer & David Nimmer, Nimmer on Copyright* § 8.20[A], at 8-636 to -637 (2017) (observing that one of the "important function[s] of the display right" is its application to the electronic transmission of works that "does not implicate the reproduction right").

47.     Nowhere in the Copyright Act does it require that the accused infringer (such as BuzzFeed or Time.com) first have copied the work to its own server in order to "display" that work. This requirement collapses the display right and the reproduction right, effectively requiring an antecedent violation of the reproduction right before the display right can be violated. Such a result is "at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

48.     The Sever Test conflicts with several other provisions of the Copyright Act that contemplate infringing "transmissions" by persons who neither possess nor control the physical copy from which the transmission is made. For example, Section 110(5)(A) creates an exemption to the display right, stating that it is not an infringement to display or perform a work by receiving it on a single home apparatus, unless various other conditions are met.  The Act states that, within certain limitations, the following is not an infringement: "communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless – (i) a direct charge is made to see or hear the transmission; or (ii) the transmission thus received is further transmitted to the public." 17 U.S.C. § 110(5)(A).

49.     Congress passed this provision to protect copyright owners following the United States Supreme Court's decision in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975), in which the Court, prior to the 1976 Copyright Act, found no infringement of copyright when a small "fast-food" restaurant broadcast musical performances that were overheard by the public during their short stays at the establishment. Cf. *Hickory Grove Music v. Andrews*, 749 F. Supp. 1031, 1037-39 (D. Mont. 1990) (finding infringement under new Act where "sit-down" restaurant broadcast radio programs into its lobby and dining room).

50.     The House Judiciary Committee's Report on the Section 110(5) exemption states:

[T]he clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their

customers' enjoyment, but it would impose liability where the proprietor has a commercial "sound system" installed or converts a standard home receiving apparatus (by augmenting it with sophisticated or extensive amplification equipment) into the equivalent of a commercial sound system.

H.R. Rep. No. 94-1476, at 87, reprinted in 1976 U.S.C.C.A.N. at 5701.

51.     Congress enacted this exemption because it recognized that, without it, "commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment," would otherwise be displaying or performing the work, as the broad statutory definitions provide. However, under Instagram's misinterpretation of "display," which does not require storage of the work, a proprietor's turning on a radio or television for customers would not be considered a display or performance, and therefore would not call for an exemption. This interpretation of the definition of "display" simply cannot be reconciled with this statutory exemption.

52.     The same logic applies to numerous other provisions of the Act, which exempt "transmissions." *See*, *e.g.*, 17 U.S.C. § 111 ("secondary transmission of a performance or display"); *id.* § 118 ("performance or display" by noncommercial educational broadcast stations); *id.* § 119 ("secondary transmissions of a performance or display of a work embodied in a primary transmission"). The assumption that a transmission can have only one actionable source, therefore, and that such source must only be the place where the physical copy of the work resides is not consistent with Copyright Act's structure and purpose.

53.     Other methods of linking (or hyperlinking) to content that do not result in the unauthorized display of content remain unaffected here. For example, standard text hyperlinks that users click in order to be directed to and visit other sites to view content are not themselves an infringing use of copyrighted content. *See Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 250-51 (S.D.N.Y. 2013). Instagram is also in the business of creating content as are the third party media publishers that are the direct infringers that embedded here. Presumably, all content creators have the same interest as Plaintiffs and seek to maintain control over their copyrighted works, such as news articles, videos or images. But applying the Sever Test would mean that they would be unable to stop anyone—even competitors—from embedding their content without

authorization. As alleged below, Instagram is liable for the conduct of third-party embedders who used the embed tool (HTML code) as a "device or process" to cause copyrighted works to be displayed (and/or playable in the case of videos) on each third-party website and, therefore, Instagram contributed to causing the "display" of copyrighted works for purposes of the Act without those third-party publisher embedders ever having actual possession of the copyrighted works.

**B.**     **Instagram Introduces Embedding While Breaking Its Promise To Respect The Rights of Copyright Owners.**

54.     On December 18, 2012, Instagram, having just been acquired by Facebook, announced that its new terms of use granted itself the perpetual right to sell users' photographs without payment or notification, a dramatic policy shift that sparked a public outcry. The most material and inequitable of the terms included the following: "*You agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you*…"

55.     The new policy was slated to take effect on January 16, 2013, just three months after Facebook completed its acquisition of Instagram. That same week, Instagram quickly relented to public protest and announced it would "remove" the language that had caused a user revolt amid strong public objections from prominent photography magazine publishers such as National Geographic and other copyright owner advocacy trade organizations and groups.

56.     On January 19, 2013, Instagram's new terms of use went into effect without the offending provision. Instagram made it clear in public pronouncements and its new terms of use that it "respected" copyright and was not going to sell and monetize users' photos to third parties. With the value of its $1 billion acquisition of Instagram now at risk, Facebook needed ways to generate revenue from Instagram, which at the time was generating no income.

57.     Thus, in July 2013, Instagram announced a new tool for sharing content outside of the Instagram application, otherwise known as embedding. Embedding was originally marketed as a new tool to share one's own photos or videos from one's Instagram account to "your own

website or blog." But Instagram had other plans that it was less public about, including the scheme of embedding of copyrighted works onto third party websites and blogs that were hosted outside of Instagram's platform. That month, Instagram rolled out a "pilot program" with Bleacher Report, Mashable.com, CNN.com, HuffPost.com and People.com to test drive the new "embedding" tool.

58.     As alleged, "embedding" is a technical process by which a copyrighted work is made visible and displayed without the copyrighted work being stored on the server of the third-party website.  In other words, embedding opens a window into the photo or video on Instagram that is displayed on the third-party website. In general, a webpage is a made up a series of instructions usually written in Hypertext Markup Language ("HTML"). Such instructions are saved to a server, which is essentially a computer connected to the Internet. When a user wishes to view that webpage, his or her computer's browser connects with the server, at which point the HTML code instructs the browser on how to arrange the webpage on the user's computer. In other words, the HTML code is converted into what the viewer perceives, including photo and videos.

59.     The HTML code allows for the arrangement of text and/or photographs and/or videos on a page and can also include photographs or videos to be available to be displayed. When including a photograph or video on a webpage, the HTML code instructs the browser how and where to place the photograph(s) or video(s). Put another way, "embedding" a photograph or video on a webpage is the act of a technical web coder adding a specific "embed" code to the HTML instructions that incorporates a photograph or video (jpeg code or mpeg code), hosted in this case on Instagram's server, to be displayed on a third-party webpage that the third-party controls with regard to the surrounding text, photos or videos around the embedded work. To embed a photo or video, the coder or web designer adds the specific "embed" code assigned to a public Instagram user's post to their website's HTML instructions. Once published, this code directs a website viewer's browser to the photo or video's location on the Instagram server and creates a bridge or window across the internet so that the photo or video is displayed within the context of the target website from where it sits on the Instagram server. Viewers of the third-party

webpage that is displaying the photo stored on Instagram do not know or care that the photo is stored on Instagram's server. This is analogous to the functionality of that same viewer using a cloud-based service to store files on a third-party server such as iCloud or Dropbox, or one streaming a film from Netflix that is displayed on the viewer's TV or computer, yet a physical copy of the film is never stored on the viewer's TV or computer. If one is displaying a film through a streaming (Netflix) or cloud-based (iCloud) server without a license or authorization (*i.e.*, selling tickets to watch the film or illegally using someone's user name and password to gain access to the display of content without paying for it), such third party would claim that its display right was violated and therefore the one displaying of the film (even a single image of the film) may be liable for copyright infringement.

60.     To secretly enhance Instagram's embedding tool's functionality and generation of revenue, in 2016 or earlier, Instagram likely started putting tracking code technology that attached to users' photos and videos uploaded to Instagram as a means to measure, handle, monitor, track and monetize the most valuable copyrighted works, *i.e.,* the works that generated the most traffic.

61.     Beginning in 2013, Instagram induced and encouraged third party embedders to display copyrighted works without permission from the copyright holders or from Instagram.

62.     Plaintiffs and the members of the Class have been subject to Instagram's scheme since 2013 when Instagram created the embed tool to embed copyrighted works without the necessary means for copyright holders to enforce their copyrights, all while Instagram was actively engaged in direct handling of copyrighted works for third parties to use.

63.     In other words, the embed tool was built by Instagram to create a "frictionless" system that made it quick, easy and cheap to take copyrighted works and embed them into a third-party website without the copyright owner ever being given notice of such embed. Likewise, a viewer of the webpage where the copyrighted work is "embedded" likely does not even know that the photo or video displayed in the body of the webpage has been "embedded" into the page with the actual photo or video's file being stored and saved on Instagram's server.

64.     To a viewer of the webpage, content embedded from an Instagram user's public account appears no differently than other content within the page, be it an advertisement,

clickable link, or the third-party website's original and/or owned or licensed content. A viewer of that website does not even need to be an Instagram user or have an Instagram account to view Instagram photos or videos embedded within any third-party webpage.

65.     All Instagram account holders allegedly agree to Instagram's Terms of Use (whatever is applicable at the time and any subsequent updates) in order to initially open an account and use the platform (upload their photos and videos). Pursuant to Instagram's Terms of Use applicable at the time, Instagram makes it clear and promises to users that each user retains ownership of their copyrighted photos and videos that are posted to the user's Instagram accounts ("we respect copyright!"). Even though each user agrees to grant Instagram a nonexclusive license to the content the user uploads and posts to their accounts, including any copyrighted photos or videos, Instagram added the *option* to sublicense those copyrighted photos or videos to third parties should Instagram elect to do so.

66.     However, Instagram has publicly admitted that it has never exercised the option, never granting any third-party embedder a license or sublicense to any of the Plaintiffs' or class members photos or videos at issue. In fact, no third-party embedder has any evidence of a license or sublicense or implied sublicense from Instagram. Thus, the use of the embedding tool under these factual circumstances violates the Copyright Act and Instagram's own Terms of Use, whatever it applicable at the time.

67.     Importantly, Instagram embed users (*i.e.*, third party website publishers such as BuzzFeed.com and Time.com) agree to be bound by an additional set of rules contained within Instagram's Platform Policy from 2013 through the present. Notably, the Platform Policy contains no language to suggest, imply, or indicate that Instagram automatically grants embed users a license or sub-license or implied sublicense to freely use, display, publish, distribute, copy or embed the photos or videos of users such as Plaintiffs and the members of the Class without first ensuring that the embedder received "all rights necessary to display the content" of the Instagram user that owned the copyrighted work.

68.     Even more critical for Instagram's liability for secondary infringements caused by embedding by the website publishers, nowhere in any version of the Platform Policy or any

version of the Terms of Use is the application or reference to the "Server Test" found directly or indirectly in these documents. In fact, the opposite is true: Instagram recognizes and admits that third parties must obtain all necessary rights (permission from the copyright holder) *before* embedding the copyrighted work as admitted in open court on December 1, 2020.

69.     Plaintiffs and the members of the Class never intended or agreed that users of Instagram's embed technology would receive an automatic sublicense from Instagram to Plaintiffs' and the Class members' respective photos and videos, which would be contrary to Instagram's public promise to respect the copyright and each version of the Terms of Use and Platform Policy. By analogy, Instagram is a buffet table at a restaurant and Plaintiffs' Instagram accounts are the trays holding the food which are the copyrighted photos and videos. Just because third-party embedders are given access to the buffet table (impliedly a frictionless, lawless system), as well as Plaintiffs' photos and videos (valuable dishes of food), does not mean that the embedders can freely eat from the buffet table without asking permission or paying an agreed price for the food being offered.

70.     To add to the inequitable challenges faced by Plaintiffs and the members of the Class in enforcing their copyrighted works, Instagram does not offer a copyright management tool or other mechanism for Instagram users that own copyrights, to give such copyright owners the ability to track which third parties embed their photos and videos. Users such as Plaintiffs and the Class members have no viable means to track the rampant copyright infringement that the Instagram platform enables through embedding. This forms one of the lynchpin pieces of evidence for injunctive relief, especially considering Instagram's public admission that it never once granted a license via the option it held in the Terms of Use.

71.     Instagram's position regarding the application of the "Server Test" is inconsistent and contradictory with its public reminder and admission in court to embedders that they needed to obtain permission from the copyright holder because Instagram has never granted a third party a license to a copyrighted work that is embedded.

72.     Instagram is the beneficiary of millions of copyrighted photos and videos uploaded by its users. Defendant reaps billions of dollars annually from hosting, tracking, encouraging,

handling, and causing a significant number of such photos and videos, which include hundreds of thousands or even millions of registered copyrighted works, to be embedded and therefore infringed by third parties who used the embed tool.

73.     Instagram knew of the infringements or was reckless in its disregard of its users' rights, and permitted and facilitated infringements of third-party embedders because no third-party embedder ever obtained a license or permission from the copyright owner or from Instagram. While Instagram informed Plaintiffs and the members of the Class that their photos and videos belonged to them and agreed to not sell or monetize those works, Instagram directly benefitted from the infringing activity that it induced or contributed to by handling such content on a regular and systematic basis. In other words, each year since 2013 Instagram handled and elevated copyrighted content by causing third party website publisher embedders to display that content, which in turn drove traffic and other monetizable activities back to Instagram's platform.

74.     From its launch of the Instagram embed tool, Instagram went from reporting zero revenue in 2012 to reaping billions of dollars in profits each year, receipt of which was highly dependent on the rapid growth in online postings (or "uploads") of valuable copyrighted works. While third-party embedders allegedly agreed to the Platform Policy and Terms of Use (which have changed multiple times from 2013 to 2020 but stayed materially consistent as to copyright policies and permission from the copyright owners), Instagram has not only done nothing to monitor whether third party embedders certify, warrant, or represent that the third party has secured permission or a license from the copyright owner, Instagram actively encouraged, aided and induced the most active offenders such as BuzzFeed, Mashable, Time, People, HuffingtonPost.com and other third parties to embed such valuable content, including hiring public relations firms and internal employees to sell and market user content for Instagram's benefit.

75.     Instagram intentionally and brazenly encouraged, aided and induced third party embedders to cause to be displayed copyrighted photos and videos without making any effort to control or stop the rampant infringement occurring on its platform while knowingly participating in such conduct.

76.     Instagram operates in a two-sided market where it seeks to both encourage active user engagements (views, likes, comments, shares etc.) and at the same time induce users to post a steady stream of photo and video content (some estimates of 95 million photos per day).  While the posting of content is key, the sharing and embedding of it outside the Instagram app across the Internet to third-party websites is just as important because it keeps existing Instagram users interacting with the Instagram environment and introduces the product to new users – the ultimate goal of each being the monetization of user behavior through the microtargeting of advertising to individual users.

77.     Instagram's motives are transparent.  The volume of quality user photo and video content is the source of "network effects." A vast library of copyrighted content draws and attracts third-party embed users to Instagram, and the growth in users incentivizes the posting of more content on Instagram, which in turn enables Instagram to reap more revenue. Building extensively on the backs of copyright holders who never gave express authorization to third-party embed users for their works to be displayed via the embed tool, Facebook reported that it generated $70 billion in annual revenue, with $9 billion in revenue in 2019 and over $13 billion in 2020 from advertising on Instagram alone.

78.     Facebook, Instagram's parent company, is estimated to control 23% of the online advertising market with Instagram accounting for approximately 32% of that. Much of that ad revenue is built on data Facebook gathers from Instagram users drawn to Instagram by infringing material, with the Facebook and Instagram platforms being integrated in various ways such as cross-platform messaging linked user profiles, and other behind-the-scenes ways not visible to the public.

79.     It has been "wildly commonplace" for Instagram to suggest, pitch, handle or promote/elevate user copyrighted content for third party embed users to display on their websites. The top publisher embed users such as BuzzFeed, Mashable, Time, HuffingtonPost.com and other third party embedders have had a direct line of communication with Instagram and its agents from 2013 through the present because of the mutual benefit to all involved – except the copyright owners.

80.    While Instagram's Terms of Use grant Instagram a license to a user's video and photo content, and the *right* to sublicense that content to third-party embed users, Instagram has never granted a sublicense to a third party embed user. If Instagram had automatically granted a sublicense, that would likely violate the public's trust that Instagram pledged and promised to never sell and monetize user's photos or videos with third parties. Instagram has nonetheless engaged in conduct that has allowed uncontrolled and knowing copyright infringement through its embed tool.

81.    Since 2013, Instagram knew that its embed users needed to obtain an express license or permission to embed copyrighted works from Instagram and Instagram has never granted a license or express permission to any third-party embedder for the copyrighted works. For example, on June 1, 2020, in *McGucken v. Newsweek LLC et. al.*, No. 1:2019cv09617 (S.D.N.Y. June 1, 2020), the Court held (ECF No. 35) that there was no evidence that Instagram's Terms of Use gave Newsweek.com a sublicense to Plaintiff photographer McGucken's photo that Newsweek had embedded from his Instagram account into an online Newsweek post. There is also no evidence in this case that Instagram's Terms of Use as it relates to its embedding code apply to the "Sever Test."

82.    Facebook, which owns and controls its subsidiary, Instagram, publicly confirmed on June 4, 2020, that Instagram's Platform Policy does not automatically give embed users, a license or sub-license to use and display the content of Instagram's general user population:

> While our terms allow us to grant a sub-license, we do not grant one for our embeds API. Our platform policies require third parties [such as BuzzFeed or Time or Mashable] **to have the necessary rights from applicable rights holders. This includes ensuring they have a license to share this content**, if a license is required by law.

*See* https://arstechnica.com/tech-policy/2020/06/instagram-just-threw-users-of-its-embedding-api-under-the-bus/

83.    Until this public admission, another court found that there was "insufficient evidence to find that Instagram granted [third-party embedders] a sublicense to embed Plaintiff's Photograph on its website," *See Sinclair v. Ziff Davis, LLC*, No. 18-CV-790 (KMW), 2020 WL

3450136, at *1 (S.D.N.Y. June 24, 2020). Instagram never clarified or likely even enforced its own policies regarding third-party embed users needing a license or permission. This is likely because Instagram enjoyed the benefits of the rampant infringements from its embedding tool and coyly remained "agnostic" and "neutral" as a service provider tech platform to avoid acting or being deemed a media company that is liable for the content it publishes. Rather, it was in fact behind the scenes pitching, promoting and/or handling valuable copyrighted works as if it were a media company publisher.

84.     From 2013 until 2020, third party embed users were led to believe, as were Plaintiffs, that because Instagram and its agents were elevating, sharing, pointing to, and promoting content for them to see (*here, look at this beautiful dish in the buffet table!*) and everyone else in the online website publishing world was eating free from the "buffet table of photos" on Instagram, each of them could eat for free as well.

85.     Notably, Instagram, through its parent company Facebook, also went on the record in a hearing in the United States District Court for the Southern District of New York before Magistrate Judge Barbara Moses, declaring through its counsel that "Facebook [Instagram] is free to, under its policies…..to grant such sublicenses, but they did not do that. And they did not do that for anybody and the anybody would, of course, then include [Defendant] Mashable in this situation." *Sinclair v. Mashable, Inc*., No. 18-cv-790, Tr. of Proceedings, at 8:24-9:4 (Dec. 1. 2020). In this case, "Mashable" can be replaced with all third-party embedders, which neither obtained a license from Instagram nor Plaintiffs or the Class members to display Plaintiffs' or the Class members' photos from Plaintiffs and the Class members' respective Instagram accounts. Instagram is therefore liable for inducing and permitting such copyright infringements to occur as a result of the use of Instagram's "embed" tool.

86.     Instagram is the proximate cause of the infringing conduct herein alleged because it knew about the infringements of all embedders, and directly benefited from the infringing content. In other words, the embed tool was built and offered by Instagram as a means of creating an "end-around" to the protections of the Copyright Act and eviscerating a copyright holders'

- 27 -

1   display, performance and distribution rights, all the while withholding tools that would help

2   copyright holders locate and discover violations of those rights.

3                              **V.   STATUTE OF LIMITATIONS**

4          87.    Throughout the time relevant to this action, Instagram affirmatively suppressed,

5   concealed, and omitted from Plaintiffs and Class members its acts and omissions violating

6   Plaintiffs and Class members' rights since at least July 1, 2013 when the embed tool was

7   introduced.  Defendant willfully and knowingly kept Plaintiffs ignorant of vital information

8   essential to their rights and violations thereof essential to pursue the claims herein alleged. As a

9   result, Plaintiffs could not have discovered the violation of rights, even upon exercise of

10  reasonable due diligence until, at the earliest, December 2020 when Instagram, through

11  Facebook, admitted in open court the truth regarding embedding.

12                          **VI.   CLASS ACTION ALLEGATIONS**

13         88.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

14  Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following

15  class:

16              All individual persons or entities who, from July 1, 2013 to the
17              present ("Class Period"), owning the exclusive right to publicly
                perform, reproduce, publicly display, or distribute film, audiovisual,
18              or photographs and/or videos over the Internet for any work first
                going into the public domain after December 31, 1977 and whose
19              registered copyrighted work(s) have been uploaded to Instagram,
                where such copyrighted owner has had their copyrighted work
20              embedded and caused to be displayed via Instagram's embedding
                tool on a third party website without the copyright owner's consent,
21              permission or a license.

22

23  Excluded from the class are: (a) Instagram and its parent, Facebook; (b) the subsidiaries and

24  affiliates of Instagram and Facebook; (c) any person or entity who is a partner, officer, director,

25  employee, or controlling person of Instagram or Facebook; (d) any entity in which Instagram or

26  Facebook have a controlling interest; (e) any rights holder to whom Instagram or Facebook have

27  directly granted express permission for a license to a third party embedder for acts of

28  infringement occurring after such license began; and (f) the legal representatives, heirs,

successors, and assigns of any excluded party. Plaintiffs reserve the right to amend the Class definition if further investigation and/or discovery reveal that the Class should be expanded, divided into subclasses, or otherwise modified. Pursuant to Federal Rules of Civil Procedure 23(a)(1), the members of the Class are so numerous that joinder of all members is impracticable. The exact number of Plaintiff class members is presently unknown, but is reasonably ascertainable applying objective criteria. The number of Class members is anticipated to be potentially many thousands based on the number of embeds on the Instagram platform.

89.    Pursuant to Federal Rule of Civil Procedure 23(a)(2) and (b)(3), there are questions of law or fact common to the Class members. The Class members uploaded and distributed their copyrighted photos and/or videos to Instagram with the objective expectation that third-party embedders would obtain permission, consent or a license to use or display such copyrighted work(s). The claims of the Plaintiffs and the members of the Class arise from the uniform method by which Instagram induced copyright infringement by making available copyrighted works to embedders without requiring them to acquire a license or permission, and therefore properly compensate, copyright holders. The claims of Plaintiffs and the Class members arise from a common federal statute and legal theory and a common nucleus of operative facts is applicable to the claims of each Class member. This liability question may be decided by one Court. The common questions of law and fact include, but are not limited to:

a.    Whether Defendant's conduct as alleged constitutes an infringement of the copyrights held by Plaintiffs and the Class in their respective works.

b.    Whether Defendant's conduct as alleged constitutes contributory copyright infringement of the copyrights held by Plaintiffs and the members of the Class.

c.    Whether Defendant's conduct as alleged constitutes inducement of copyright infringement of the copyrights held by Plaintiffs and the members of the Class.

d.    Whether Defendant's conduct as alleged constitutes vicarious infringement of the copyrights held by Plaintiffs and the members of the Class.

e.    Whether Defendant acted willfully with respect to the copyright infringements alleged.

f.      Whether Defendant has deliberately avoided taking reasonable precautions to deter copyright infringement from the embed tool.

g.      Whether Defendant has reasonably implemented a policy and procedure to prevent infringements of the copyrights held by Plaintiffs and the members of the Class on Instagram via the API embed tool.

h.      Whether Plaintiffs and the members of the Class have sustained injury and, if so, what is the proper measure of relief.

90.     Pursuant to Federal Rule of Civil Procedure 23(a), Plaintiff's claims are typical of the claims of the other members of the Class since Plaintiffs and all members of the Class were deprived of the statutory compensation for the use of their copyrighted works.

91.     Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class and have retained counsel experienced in federal copyright law matters and class action lawsuits.

92.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the injury suffered by individual Class members may be relatively small, and the expense and burden of individual litigation would therefore make it impossible and/or impracticable for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

93.     Certification of Plaintiff's claims for class action treatment is also appropriate pursuant to Federal Rules of Civil Procedure 23(b)(2) because Instagram has acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Class in failing and refusing to compensate Plaintiffs and Class members for the unlawful use and reproduction of their copyrighted works, and failing or refusing to modify its platform which permits rampant embedding by third parties of copyrighted material, making appropriate both declaratory and injunctive relief with respect to Plaintiffs and the Class. Instagram's records reflect the identities of the Class members whose copyrighted materials have been posted on their platforms without

1   compensation according to law. As a result, Plaintiffs seek to represent an ascertainable Class, in

2   that determining membership in the Class can be accomplished through access to Instagram's

3   own records.

4                               **FIRST CAUSE OF ACTION**

5                          **(Inducement of Copyright Infringement)**

6       94.    Plaintiffs incorporate herein by this reference each and every allegation contained

7   in each paragraph above.

8       95.    Instagram's embed users have infringed and are infringing Plaintiffs' and the Class

9   members' rights in their registered copyrighted photos and video and audiovisual works by, *inter*

10  *alia*, embedding infringing copies of Plaintiffs' and the Class members' copyrighted works onto

11  and from Instagram's platform and publicly performing, displaying, distributing, and

12  reproducing, or purporting to authorize the public performance, display, distribution, or

13  reproduction of such copyrighted works or infringing videos, all without authorization from

14  Instagram or Plaintiffs and the members of the Class.

15      96.    Instagram's embed users are therefore directly infringing Plaintiffs' and the Class

16  members' exclusive rights of reproduction, distribution, public performance, and public display

17  under U.S.C. §§ 106(1), (3), (4), and (5).

18      97.    Defendant is liable under the Copyright Act for inducing the infringing acts of

19  Instagram's embed users. Defendant exercises control over and/or influences which photos and

20  videos its embed users embedded and which infringing material gets removed or does not get

21  removed from its platforms.

22      98.    Defendant operates with the objective of promoting its use to infringe Plaintiffs'

23  and the Class members' copyrights and is unlawfully fostering copyright infringement by

24  Instagram embed users.

25      99.    Defendant knew or recklessly disregarded that Plaintiffs and the Class members'

26  photos and audiovisual works are copyrighted and authorized for purchase through various

27  outlets, including numerous lawfully authorized online digital download services, or for licensing

28  from the Class members or their agents.

100.   Defendant is also aware that its embed users are employing Instagram to unlawfully reproduce, distribute, publicly perform, and publicly display Plaintiffs' and the Class members' copyrighted works. Defendant intends for, encourages, and induces Instagram embed users to employ Instagram in this regard.

101.   Defendant's acts of inducing copyright infringements have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

102.   As a direct and proximate result of Defendant's inducement of infringements of Plaintiffs and the Class members' exclusive copyrights, Plaintiffs and the Class members have been damaged.

103.   Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class members great and irreparable injury that cannot fully be compensated.

104.   Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class members are entitled to a permanent injunction requiring Defendant to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class members' copyrights.

**SECOND CAUSE OF ACTION**

**(Contributory Copyright Infringement)**

105.   Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

106.   Instagram's embed users have infringed and are infringing Plaintiffs and the Class members' rights in their registered copyrighted photos, and audiovisual works by, *inter alia*, embedding infringing copies of Plaintiffs and the Class members' copyrighted works onto and from Instagram's platform and publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted works or infringing videos, all without authorization. Instagram's embed users are therefore directly infringing Plaintiffs and the Class members' exclusive rights of reproduction, distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

107.   Defendant is liable as a contributory copyright infringer for the infringing acts of Instagram embed users. Defendant enables, induces, facilitates, and materially contributes to each act of infringement by Instagram embed users.

108.   Defendant has actual and constructive knowledge that its embed users are using its platform to copy, distribute, publicly perform, and publicly display Plaintiffs' and the Class members' copyrighted works. Acting with actual and constructive knowledge, Defendant enables, facilitates, and materially contributes to Instagram embed users' copyright infringement, which could not occur without Defendant's enablement.

109.   Defendant's acts of contributing to direct infringement of the embed users have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

110.   As a direct and proximate result of Defendant's contributory infringement of Plaintiffs and the Class members' exclusive copyrights, Plaintiffs and the Class have been damaged.

111.   Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated.

112.   Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction requiring Defendant to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class members' copyrights.

**THIRD CAUSE OF ACTION**

**(Vicarious Copyright Infringement)**

113.   Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

114.   Instagram's embed users have infringed and are infringing Plaintiffs and the Class members' rights in their registered copyrighted photos, and audiovisual works by, *inter alia*, embedding Plaintiffs and the Class members' copyrighted works onto and from Instagram's platform and are publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted

1   works or infringing videos, all without authorization. Instagram's embed users are therefore

2   directly infringing Plaintiffs and the Class members' exclusive rights of reproduction,

3   distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

4       115.   Defendant is vicariously liable for the infringing acts of Instagram's embed users.

5       116.   Defendant has both the right and the ability to supervise, monitor, track and

6   enforce Instagram's embed users' infringing conduct and to prevent Instagram's embed users

7   from infringing Plaintiffs and the Class members' copyrighted works.

8       117.   Instagram significantly and directly benefits from widespread infringement by its

9   embed users. The availability of a vast collection of valuable, quality copyrighted works on

10   Instagram acts as a substantial draw, attracting embed users to the platform. The more works that

11   are embedded by third-party embedders, the more user traffic and amount of time Instagram users

12   spend there when they visit the platforms and the traffic sent back into the Instagram platform.

13   Defendant derives substantial advertising revenue tied directly to the volume of traffic it is able to

14   attract to Instagram.

15       118.   Defendant's third-party embedder infringements have been willful, intentional,

16   purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

17       119.   As a direct and proximate result of Defendant's third-party embedder

18   infringements of Plaintiffs and the Class members' exclusive copyrights, Plaintiffs and the Class

19   have been damaged.

20       120.   Defendant's conduct is causing and, unless enjoined by this Court, will continue to

21   cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated.

22       121.   Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent

23   injunction requiring Defendant to employ reasonable methodologies to prevent or limit

24   infringement of Plaintiffs' and the Class members' copyrights.

25                **VII.   RELIEF REQUESTED**

26       122.   Wherefore, Plaintiffs, on behalf of themselves and the members of the Class, pray

27   for judgment against Defendant as follows:

28

- 34 -

1      a.     Determining that this action may be maintained and certified as a class

2              action pursuant to Federal Rule of Civil Procedure 23 and directing that

3              reasonable notice of this action be provided to the Class pursuant to Rule

4              23(c)(2).

5      b.     Awarding Plaintiffs and the Class damages derived from the infringing

6              acts, and/or statutory damages, in the amount permitted by law with respect

7              to each work infringed, including statutory damages for willful and/or

8              reckless misconduct.

9      c.     Granting Plaintiffs and the Class injunctive and other equitable relief

10            enjoining Defendant, its officers, agents, servants, and employees, and all

11            those acting in concert with the aforementioned parties:

12           i.     From directly or indirectly reproducing, publicly performing,

13                publicly displaying, or distributing the copyrighted works to which

14                Plaintiffs and the Class have exclusive rights.

15           ii.    From causing, contributing to, inducing, enabling, facilitating, or

16                participating in the infringement of any of the copyrighted works

17                which are the property of the Plaintiffs and the Class members.

18      d.     To affirmatively adopt, implement, and offer to all persons tools and all

19            other measures available, including tracking code, and those measures that

20            shall become available in the future, to identify and protect copyrighted

21            content embedded without consent and prevent it from being embedded or

22            otherwise made available through the facilities owned, operated, or

23            controlled by Defendant.

24      e.     Disgorging all profits derived by Defendant that were illegally obtained as

25            a result of the conduct alleged herein.

26      f.     Awarding prejudgment interest to the maximum extent permitted by law.

27      g.     Awarding Plaintiffs' attorneys' fees, costs, and expenses in this action.

28

- 35 -

1          h.      Awarding such other and further relief as the Court may deem just and

2          proper.

3                          **VIII.   JURY TRIAL DEMANDED**

4          123.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a

5   trial by jury of all the claims asserted in this First Amended Complaint so triable.

6

7   Dated: October 18, 2021                Respectfully submitted,

8                                          CERA LLP

9                                          By: /s/Solomon B. Cera
10                                         Solomon B. Cera
                                           595 Market Street, Suite 1350
11                                         San Francisco, CA 94105
                                           Telephone: (415) 977-2230
12                                         Email: scera@cerallp.com

13                                         DUNCAN FIRM, P.A.
14                                         James H. Bartolomei III
                                           809 W. 3rd Street
15                                         Little Rock, AR 72201
                                           Telephone: (501) 228-7600
16                                         Email: james@duncanfirm.com

17                                         HOBEN LAW
18                                         Bryan D. Hoben (admitted *pro hac vice*)
                                           1112 Main Street
19                                         Peekskill, NY 10566
                                           Telephone: (347) 855-4008
20                                         Email: bryan@hobenlaw.com

21                                         LAW OFFICES OF TODD M. FRIEDMAN, P.C.
22                                         Todd Friedman
                                           21550 Oxnard Street, Suite 780
23                                         Woodland Hills, CA 91367
                                           Telephone: (877) 206-4741
24                                         Email: tfriedman@toddflaw.com

25                                         *Attorneys for Plaintiffs and the Proposed Class*

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 3:21-CV-03778-CRB
FOR DAMAGES BASED ON COPYRIGHT INFRINGEMENT